# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

––––––––––––––––––––

UNITED STATES OF AMERICA,

       Plaintiff,

    v.                                         Civil No. 05-243 WJ/WPL

$1,999,500.00 in U .S. Currency
and $9,800.00 in U.S. Currency,

       Defendant,

and

Avtar Verma,

       Claimant.

## <u>MEMORANDUM OPINION AND ORDER</u><br><u>GRANTING IN PART MOTION TO DISMISS</u>

       THIS MATTER comes before the Court on Claimant Avtar Verma's motion to dismiss the Government's *in rem* forfeiture action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted (**Doc. 15**, filed May 9, 2005).  Claimant challenges the Government's forfeiture of over one million dollars seized during a search conducted on an Amtrak train which arrived in Albuquerque on or about September 22, 2004.  The Complaint alleges that the currency is subject to forfeiture under 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1). For the following reasons, the motion is denied in part and granted in part.

### Factual Background

       Claimant contends that the facts as presented in the Complaint are not sufficient to state a

claim for forfeiture.  Since the sufficiency of the allegations is at issue here, a recitation of these allegations is necessary for an adequate orientation to the legal issues that are involved.

Avtar ("Claimant") and Ajay Verma, father and son, were traveling one-way on Amtrak from Flagstaff, Arizona to New York City on one-way tickets purchased about seven hours prior to the train's departure.  (Complaint, ¶ 9). When the Amtrak train arrived in Albuquerque on September 22, 2004, Agent Kevin Small from the Drug Enforcement Administration ("DEA") identified himself to the Vermas as a police officer and requested and received permission to talk to them.  (Complaint, ¶¶ 10 & 15).[1]  Ajay Verma told Agent Small that he and his father they were traveling to New York for their clothing business.  He stated that they would be in New York for 10 days and planned to stay at his uncle's house.  Avtar Verma also told Agent Small that they would be staying at his brother-in-law's house.  (Complaint, ¶¶ 11 & 16).

Inside the Verma's room were two large suitcases and a small black suitcase.[2]  Agent Small asked for permission to search the luggage. Ajay Verma denied consent, but agreed to have a drug detection canine smell the luggage, and allowed Agent Small to enter the room and move the luggage so a canine could smell the luggage.  Ajay Verma told Agent Small that the suitcases contained "just clothing."  (Complaint, ¶¶ 12-13).  Agent Small observed that the suitcases were "extremely heavy."   When they were weighed later, the large suitcases weighed 62 pounds and 60 pounds.  The drug detection canine "Taz" checked all the luggage in the room, but did not alert to any of the items, although the dog "showed a strong interest" in the large black suitcase.

---

[1]  The Complaint states that Agent Small identified himself at different times to Ajay and Avtar Verma.  However, there is no dispute that the identification was made.

[2]  Although not expressly stated in the Complaint, it appears that one of the large suitcases was green, and the other was black.

Agent Small informed the Verma that the dog did not alert and asked why the bags containing "just clothing" were so heavy.  Both Ajay and Avtar Verma's stated the suitcases also contained "books."  Agent Small then asked why they had books in their luggage. Avtar Verma stated that he was going to read the books while he was on the trip.  Due to the weight, Agent Small questioned how Avtar Verma could read that many books in 10 days and still go on a business trip. (Complaint, ¶¶ 17-18).

Agent Small informed the Vermas that he was going to detain their luggage and attempt to get a search warrant. (Complaint, ¶ 19). After conferring with Avtar, Ajay Verma stated he would open the green suitcase and show Agent Small the books. (Complaint, ¶ 20).  Avtar Verma stepped forward and unlocked the suitcase.  Ajay Verma flipped open the lid.  There were no books visible [although a subsequent search revealed books inside the suitcase].  Ajay Verma began moving items of clothing around, which exposed numerous FedEx cardboard mailing envelopes.  Avtar Verma stated that the envelopes contained money, and in response to Agent Small's query of the amount, informed Agent Small that the envelopes contained "one million dollars." (Complaint, ¶ 21).

During a later search of the luggage at the DEA office, agents found and removed clothing, books and a bag of limes from the green suitcase and left only seven FedEx cardboard envelopes in the suitcase.  The Complaint describes a "controlled search" of the green suitcase that took place.  This involved placing the green suitcase, containing only the FedEx envelopes, and three other "untainted" bags in line against the wall spaced at eight to ten foot internals, and having "Taz" perform a search of the green suitcase.  The dog alerted positively for the odor of illegal controlled substance(s) emanating from the green suitcase.  Agents then waited an

3

appropriate length of time and placed the black suitcase in a line with three other untainted bags against wall spaced at eight to ten foot intervals, placing the black suitcase in a different position from the green suitcase in the previous controlled search.  "Taz" alerted positively for the odor of illegal controlled substances(s) emanating from the black suitcase. (Complaint, ¶¶ 23- 24).   Agent Small read Claimant his constitutional rights.

Verma told Agent Small that both large suitcases contained money that belonged to him and that he intended to use the money to make purchases for his clothing business, but could not describe these intended purchases or name any of the businesses in New York from which he was going to make these purchases.  He stated several times that the money was not from drugs or anything illegal, and told Agent Small that his son "has nothing to do with this."   Agent Small asked for the telephone number of Verma's brother-in-law at whose house Verma had stated he planned to stay, but Verma stated that his brother-in-law was not expecting him.  Verma said he might not purchase anything on this trip, but might take the money back to Phoenix with him when he returned in ten days.  (Complaint, ¶¶ 27-28).

Agent Small obtained a federal search warrant for the seven FedEx cardboard mailing envelopes and the large black suitcase.  Execution of the warrant revealed 8 FedEx cardboard mailing envelopes in the large black suitcase, making a total of 15 FedEx envelopes. All 15 FedEx envelopes contained numerous bundles of United States Currency wrapped in rubber bands.  The two suitcases contained a total of 19 books.  The green suitcase also contained a bag of limes. (Complaint, ¶¶ 29-30).  Verma told Agent Small that each envelope contained $80,000.00 in cash for a total of 1,200,000.00.

Verma told Agent Small that this was the first time he had ever taken the train, and that he

took the train because he had a heart condition and wanted to see the country.  (Complaint, ¶¶ 31, 34).  When asked how he planned to get home from New York, Verma said he planned to fly home.  Inside Verma's small laptop computer bag, searched with Verma's permission, were documents showing that the Vermas had purchased tickets to fly from Newark, N.J. to Phoenix, Arizona on Tuesday, September 28, 2004.  They were scheduled to arrive into New York on Amtrak on September 24, 2004. (Complaint, ¶ 35).  Verma and another unidentified person had reservations to stay at the New York Marriott Marquis beginning on September 24, 2004 and ending on Tuesday, September 28, 2004. (Complaint, ¶ 36).

**Discussion**

Claimant contends that the Government's Complaint does not plead facts sufficient to set forth the essential elements for forfeiture under either 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1).  The Government responds that the Complaint sufficiently states a claim for forfeiture, and also that Claimant's motion to dismiss is premature and unwarranted.  The Court addresses the latter threshold issue first.

**I.      Whether the Motion to Dismiss is Proper**

Dismissal of a complaint pursuant to Rule 12(b)(6) will be upheld only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson,355 U.S. 41, 45-46 (1957).  Civil *in rem* forfeiture proceedings are also governed by the Supplemental Rules for Certain Admiralty and Maritime Claims, which requires that the complaint

> "shall state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading."

Supplemental Rule E(2)(a); U.S. v. Mondragon, 313 F.3d at 864; U.S. v. $49,000 Currency, et al., 330 F.3d 371, 376 n.8 (5th Cir. 2003).

The Government's position is based on the relatively new scheme for civil forfeitures under the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub.L. No. 106-185, 114 Stat. 202, 205 (codified in part at 18 U.S.C. § 983), which became effective on August 23, 2000. CAFRA increases the Government's burden of proof in a civil forfeiture case from probable cause to preponderance of the evidence.  28 U.S.C. § 983(c)(1); see U.S. v. Funds in Amount of $30,670, 403 F.3d 448, 454 n.4  (7th Cir. 2005)(forfeiture proceedings commenced prior to the effective date of CAFRA applied a lesser standard of proof-- probable cause) (citation omitted); U.S. v. Wagoner County Real Estate, 278 F.3d 1091, 1097 n.5 (10th Cir. 2002) ([CAFRA] changes the government's initial burden of proof); Mondragon, 313 F.3d 862, 865 (4th Cir. 2002) (government's burden prior to CAFRA was to show probable cause for forfeiture, but after CAFRA, the government must prove by a preponderance of the evidence that the property is subject to forfeiture).

At the same time, the statute counterbalances the increased trial burden through another provision which provides that "No complaint may be dismissed on the ground that the Government did not have *adequate evidence* at the time the complaint was filed to establish the forfeitability of the property." § 983(a)(3)(D) (emphasis added). "Adequate evidence" is not defined by the statute, but has been interpreted to have relaxed or lessened the proof the Government must show in response to a motion to dismiss under Fed.R.Evid. 12(b)(6) at the onset of a forfeiture proceeding, as well as the particularity requirements in the Supplemental Rule E(2).  See Mondragon, 313 F.3d at 865 (rejecting interpretation of Supplemental Rule E(2) that

6

requires complaint to allege facts sufficient to support reasonable belief that government can

establish probable cause for forfeiture at trial); <u>United States v. 630 Ardmore Drive, City of</u>

<u>Durham, Parkwood Tp., Durham County, N.C</u>, 178 F.Supp.2d 572, 581-82 (M.D.N.C.2001)

(emphasis added) (holding that particularity requirements for forfeiture complaint set out in

Supplemental Rule E(2) must be viewed in more relaxed manner on case by case basis, based on

interpretation of CAFRA "and its relationship to other existing rules and statutory provisions

affecting civil forfeiture proceedings") (cited in <u>U.S. v. $4096.00 in U.S. Currency, More or Less</u>,

unpubl. opin., 2005 WL 1127138 (M.D.Ga.., 2005).

     The Government relies on this provision of CAFRA to argue that Claimant's challenge to

the Complaint is both premature and unwarranted.   CAFRA allows that in meeting its burden of

proof of preponderance of the evidence at trial, the Government "may use evidence gathered after

the filing of a complaint for forfeiture. . . ."  18 U.S.C. § 983(c)(2).  In other words, a complaint

for forfeiture need not meet the preponderance standard "merely to get in the courthouse door."

<u>U.S. v. Real Property Located at 5208 Los Franciscos Way</u>, 385 F.3d 1187, 1193 (9th Cir. 2004)

(motion to dismiss denied because complaint need not contain sufficient evidence for government

to meet ultimate trial burden).  The Government's argument would have merit if the Claimant

were challenging the sufficiency of the Government's evidence contained in the Complaint.

However, it seems clear that the Claimant is not challenging sufficiency of evidence the

Government will be bringing to trial, but rather the adequacy of the combined facts alleged in the

Complaint to withstand dismissal.

     After CAFRA, the standard for evaluating the complaint is a general standard which

requires the complaint to allege sufficient facts to support a reasonable belief that the property is

subject to forfeiture. <u>Mondragon</u>, 313 F.3d at 865; <u>U.S. v. Funds in Amount of $40,000</u>, unpubl

opin., 2004 WL 2191576 (N.D.Ill.,2004) (same); <u>U.S. v. $4096.00</u>, unpubl. opin., 2005 WL

1127138 (M.D.Ga.,2005) (finding that government's complaint met pleading requirements for

civil forfeiture based on connection between seized currency and controlled substances),<u>U.S. v.</u>

<u>630 Ardmore Drive</u>,178 F.Supp.2d at 581-82 (Government's forfeiture claim can advance forward

in face of motion to dismiss for failure to state claim even if government's complaint does not

provide all facts that would allow government to ultimately succeed in forfeiture proceeding).[3]

    Despite some initial confusion of standards in Claimant's initial arguments, both parties

ultimately agree on the standard that applies to civil forfeiture cases after CAFRA: that the

Government's Complaint must allege sufficient facts to support a reasonable belief that the

property is subject to forfeiture.  <u>See</u>, Reply at 3-4 and n.1; Response at 6.  What the parties

disagree on is whether the Complaint comports with this standard and whether it can withstand

the motion to dismiss.

    Claimant challenges the legal integrity of the search and suggests perfectly legitimate and

rational explanations for Claimant's behavior and the circumstances.  The Government, on the

other hand, recognizes that there are certain subject areas that need  further development during

civil discovery and at trial, such as the factual basis for Avtar Verma's claim of ownership, the

explanation for Verma's travel itinerary, the details of the dog sniff and its scientific validity, and

the actual source of the currency.  I agree with the Government that Claimant's arguments in

---

[3]  The court in <u>Ardmore</u> queried whether 18 U.S.C. § 983(a)(3)(D) (the "adequate
evidence" provision) applies to both administrative and judicial forfeiture proceedings, and
concluded that although the provision was not clear, it did apply to both types of proceedings.
<u>Ardmore</u>, 178 F.Supp. 2d at 581 n.5.

these areas go to the weight which should be afforded the facts in the Complaint, and are not relevant to the focus of this motion, which is whether the allegations in the Complaint support a reasonable belief that the Government will be able to show probable cause for forfeiture at trial, under 21 U.S.C. § 881(a)(6) and 18 U.S.C. 18 U.S.C. § 981(a)(1).  The Court's discussion for purposes of the motion, therefore, will be limited to the scope of Fed.R.Civ.P. 12(b)(6).

**II.      Whether the Complaint States a Claim for Forfeiture**

The forfeiture is being brought under both 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1).  The  Court's discussion will apply the facts alleged in the Complaint to these statutes separately.

A.      21 U.S.C. § 881(a)(6)

Under 21 U.S.C. § 881(a)(6), the following property must be forfeited to the United States:

> All money, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all money, negotiable instruments, securities used or intended to be used to facilitate any violations of this subchapter.

Claimant contends that the Government cannot show a nexus between the seized currency and a drug offense, and offers three arguments or factors, for this contention: (1) that the existence of money by itself is not enough to establish probable cause to believe the money is forfeitable; (2) that the alert by the drug detection canine also does not establish probable cause; and (3) that the Vermas' purchase of one-way tickets from Flagstaff to New York one day before traveling does not connect the seized money to a drug offense.  Since the standard on a motion to dismiss is not premised on probable cause, the Claimant's arguments will be considered in the

context of the correct standard after CAFRA.

Also, the Court declines to adopt the approach used by Claimant in arguing the insufficiency of the Government's Complaint, which is to examine each of the factors separately, unconnected to the inferences and weight provided by the other factors.  The Court agrees with the Government that the factors being challenged as inadequate by the Claimant should not be examined in isolation, but as part of a total package of factual evidence.  An examination of the Complaint entails a "common sense view to the realities of normal life applied to the totality of the circumstances."  U.S. v. $242,484.00, 389 F.3d 1149, 1160 (11th Cir. 2004);[4]  U.S. v. $149,442.43 in U.S. Currency, 965 F.2d 868, 876 (10th Cir. 1992) (factual inferences derived from basic facts must be accepted unless clearly erroneous, and the presence or absence of any single factor is not dispositive.) (in context of probable cause).  Thus, under 21 U.S.C. § 881(a)(6), the facts in the Complaint must be sufficient to connect the currency to drugs based on all the circumstantial evidence set out in the Complaint.

1.    *Connection of money to drug offense*

The existence of any sum of money, standing alone, is not enough to establish probable cause to believe the money is forfeitable.   U.S. v. $506,231 in U.S. Currency, 125 F.3d 442, 452 (7th Cir. 1997) (citations omitted); U.S. v. Funds in the Amount of $9,800, 952 F.Supp. 1254,

---

[4]  In U.S. v. $242,484, the court made findings on the sufficiency of the evidence for trial, not the sufficiency of the complaint.  Further, the case was decided under the previous version of the forfeiture statute which was superceded by CAFRA, a fact that was recognized by the court in that case: "Under the version of the forfeiture statute that superceded it and applies to cases arising on or after August 23, 2000, probable cause is no longer a central issue in forfeiture proceedings.  Nonetheless, we thought the probable cause issue in this case important enough for en banc review because of its implications for search and seizure cases."  389 F.3d at 1160.

1263 (N.D.Ill.,1996) (the magnitude of the money defendant possessed at the airport "did not, in itself, justify seizure").  Yet, the huge amount of money involved here cannot be ignored.  See, e.g., U.S. v. $242,484, 389 F.3d at 1160-61 ("The first important fact that lights up the probable cause inquiry with significance is the sheer quantity of cash that Stanford was carrying: nearly a quarter of a million dollars in currency"); U.S. v. $39,873.00, 80 F.3d 317, 318 (8th Cir.1996) (recognizing that possession of a large amount of cash is "strong evidence that the cash is connected with the drug trade").

The Complaint describes this amount of money being transported in a way which is not consistent with the usual practices of a legitimate business:  in large suitcases buried under clothes and an inordinate number of books, in FedEx envelopes, wrapped in rubber bands.  The manner of transporting the money was not consistent with the usual practices of wholesalers in New York's garment district, which normally uses bills of lading and credit cards to transact business. (Complaint, ¶ 33).  Also, Verma could not provide any documentation for the source of the money he was carrying.

Claimant argues that his case is distinguishable from cases cited by the Government for the proposition that the currency was being transported in a suspicious manner.  In those cases, currency was bundled together with rubber bands, but also wrapped in cellophane and brown paper wrapping,  U.S. v. $242,484, 389 F.3d 1149, or wrapped in three layers of zip-lock bags and fabric softener sheets, U.S. v. $141,770, 157 F.3d 600, 604 (8th Cir. 1998).  This may be so, but the court in U.S. v. $242,484 noted that the agent's suspicions were aroused by the very fact that the money was wrapped in rubber bands instead of bank wrappers separated into uniform bundles, and that this was consistent with the behavior of a courier of drug proceeds.  389 F.3d at

1162.  The way Verma's money was wrapped is by itself not indicative of a connection to drug proceeds.  See, U.S. Currency, $30,060.00, 39 F.3d 1039, 1044 (9th Cir. 1994) (carrying money in wrapped bundles not enough to connect currency to drugs).  Yet, the huge amount of currency together with its mode of transport together could indicate the currency was ill-gotten.  See, U.S. v. $242,484, 389 F.3d at 1161 ("[a] common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack").

> 2.    Alert by "Taz"

Claimant tries to weaken any probative value to be given to the alert made by "Taz," the drug detection dog because the dog did not alert to the suitcase when the Vermas consented to the dog sniff, and also because so much of the currency in the United States is contaminated with drugs.  Claimant cites to cases to support his position.  See, e.g., U.S. v. $506,231 in U.S. Currency, 125 F.3d 442, 453 (7th Cir. 1997) ("probative value of dog sniffs is, at most, minimal"); U.S. Currency, $30,060.00, 39 F.3d 1039, 1042-44 (9th Cir. 1994) (requiring an "aggregate of facts" and credible evidence in addition to a dog's positive alert to a large sum of money in order to establish probable cause for forfeiture); Muhammed v. Drug Enforcement Agency, Asset Forfeiture Unit, 92 F.3d 648, 653 (8th Cir. 1996) (the fact of contamination, alone, is virtually meaningless and gives no hint of when or how the cash became so contaminated); U.S. v. U.S. Currency, $30,060.00, 39 F.3d 1039, 1043 (9th Cir. 1994) (continued reliance of courts and law enforcement officers on dog alerts to separate "legitimate" currency from

"drug-connected" currency is logically indefensible);[5] U.S. v. Funds in the Amount of $9,800, 952 F.Supp. 1254, 1263 (N.D.Ill.,1996) (where initial seizure here was based entirely upon the fact that defendant fit the drug-courier profile, the positive dog sniff would not be admissible at trial to establish probable cause).

The Government rejects Claimant's "global contamination" theory, and it seems that the more recent case law does as well.  U.S. v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars, 403 F.3d 448, 459 (7th Cir. 2005) (properly trained dog's alert to currency should be entitled to probative weight, and noting that conclusions reached in cases finding otherwise "rest on uncritical adoption of the currency contamination theory").  In U.S. v. $141,770.00 in U.S. Currency, 157 F.3d 600, 605 (8th Cir. 1998), the Eighth Circuit affirmed the district court's exclusion of expert testimony which sought to discredit the significance of a drug detection dog's positive alerts by introducing scientific evidence that a significant percentage of United States currency is contaminated with drug residue, based on the unreliability of the methodology used to support expert opinion.

The Tenth Circuit "has consistently held that a positive dog alert by a trained narcotics dog, standing alone, is generally sufficient to support a finding of probable cause."  U.S. v. Florez, 871 F.Supp. 1411, 1417 (D.N.M.,1994) (citing United States v. Ludwig, 10 F.3d 1523, 1538 (10th Cir.1993)  (other citations omitted).  This circuit acknowledges that probable cause may not

---

[5]  The holding in this case was based on the court's recognition that "seventy-five percent of all circulated currency in Los Angeles is contaminated with drug residue."  Given this "high degree of certainty," the court found that the "probative value of a positive dog alert in currency forfeiture cases in Los Angeles is significantly diminished."  The court also made clear that evidence of currency contamination through a dog alert may have some probative value "if the degree of contamination is significantly greater than is normal for a particular city ." 39 F.3d 1039, 1043 n.1.

be established if the training and reliability of dog has not been established.  871 F.Supp. at 1417. However, this is an issue appropriately taken up for trial, and not on a motion which requires a minimal showing of a connection between the currency and drugs.

Claimant also challenges the integrity of the "controlled" search done at the DEA office. Claimant argues that a "controlled" search would have required agents to place some currency known to have not recently been exposed to narcotics in the other bag, and see if "Taz" would alert.  If the dog alerted on both the bags containing the "old" money as well as on the Verma luggage, the Government theory would not be viable.  Mot. at 9, n.2.  This is also an issue which need not be resolved here in order to determine whether the Government has presented sufficient evidence at the motion to dismiss stage.  Claimant makes much of the fact that the dog did not alert when the Vermas consented to the dog sniff, and only alerted when all other items in the suitcase were removed at the DEA offices.   However, Claimant cites to no legal authority which would diminish the significance of the second alert.  Further, the Complaint states that "Taz" showed a "strong interest in the large black . . . suitcase" (Complaint, ¶ 17).  This is not exactly consistent with a failure to alert, and may be of probative value, together with the other circumstances alleges in the Complaint.

The Vermas' purchase of one-way tickets from Flagstaff to New York one day prior to departure may indeed be indicative of innocent activity, as Claimant suggests.  However, given the circumstances surrounding the itinerary, it is not unreasonable to view them as somewhat suspicious.  First, according to the Complaint the tickets were purchased about seven hours -- not "one day" -- prior to departure according to the Complaint.  Second, the Vermas were traveling one-way from Flagstaff, Arizona to Chicago, Illinois, to New York City – but they live in Phoenix

and their business is presumably in Phoenix.  This factor alone would clearly be insufficient to

connect the seized currency to drug proceeds.   Added to some of the other circumstances set out

in the Complaint, the probative value and inferences which can be made from the facts increases:

(1) the presence of 19 books in the luggage to conceal cash; (2) the packaging of the cash, in

FedEx envelopes, buried beneath clothing and books; (3) no documentation showing the source

of over one million dollars in currency; (4) inconsistencies in Verma's story -- e.g., telling Agent

Small he was planning on staying with his brother-in-law, when he had reservation (with another

unidentified person) at a New York City hotel for four days; (5) unusual business practices for

someone in the wholesale garment industry.

     The Court also notes that although there may be a question about whether the Complaint

alleges facts sufficient to support a reasonable belief that the Government can establish probable

cause for forfeiture at trial, there is no question as to whether the Complaint meets the post-

CAFRA standard.  The collection of evidence set out in the Complaint asserts sufficient facts to

support a reasonable belief that there is a connection between the seized currency and a drug

offense, pursuant to 21 U.S.C. § 881(a)(6).  See, U.S. v. One Hundred Forty-Nine Thousand

Four Hundred Forty-Two and 43/100 Dollars ($149,442.43) in U.S. Currency, 965 F.2d 868

(10th Cir. 1992) (circumstantial evidence may support establishment of a connection to drugs) (in

context of probable cause); U.S. v. $242,484.00, 389 F.3d at 1160 (Complaint does not need to

show a relationship between the property and a particular drug transaction--only that the property

was related to some illegal drug transaction. . . "that the evidence presented would support an

alternative hypothesis does not prevent it being probative on the issue of probable cause") (in

context of probable cause); U.S. v. $242,484.00, 389 F.3d at 1162 (citing Ornelas v. United

States, 517 U.S. 690, 699 (1996)) (weight must be given to inferences that law enforcement

agents draw from the facts).  Therefore, Claimant's motion to dismiss will be denied on this basis.

B.      18 U.S.C. § 981(a)(1)

Section 981(a)(1) requires forfeiture of property involved in a transaction or attempted

transaction which violates 18 U.S.C. §§ 1956, 1957 and 1960.  Because the basis for forfeiture

under each of these statutes is different, the Court will address them separately.

1.      *18 U.S.C. § 1956(a)(1) - Money Laundering instruments]*

Section 1956(a)(1) makes it a crime to conduct or attempt to conduct a financial

transaction involving the proceeds of specified unlawful activity --

(A)(i) with the intent to promote the carrying on of unspecified unlawful activity; or
(ii) with intent to engage in conduct constituting a violation of Section 7201 or 7206 of
the Internal Revenue Code (Tax Evasion and Fraud); or
(B) knowing the transaction is designed in whole or in part -
(i) to conceal or disguise the nature, the location, the source, the ownership, or the control
of the proceeds of specified unlawful activity; or
(ii) to avoid a transaction reporting requirement under State or Federal law.

A "*financial transaction*" is defined by 18 U.S.C. § 1956(c)(4) as follows:

(A) a transaction which in any way or degree effects interstate or foreign commerce
(i) involving the movement of funds by a wire or other means or
(ii) involving one or more monetary instruments, or
(iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft.

Under § 1956(c)(3), the term "*transaction*" includes a "purchase, sale loan, pledge, gift,

transfer, delivery, or other disposition."

The Government argues that the facts alleged in the Complaint give rise to a reasonable

inference that the claimant was transporting the currency to deliver it to a third party to promote

the carrying on of specified unlawful activity, or to evade taxes, or to conceal the nature, location,

source, ownership or control of the proceeds, in violation of § 1956(a)(1)(A)(i),(ii) or (B)(i).  The Government's problem is two-fold:  Claimant's conduct as set out in the Complaint does not constitute a "financial transaction" under the statute, nor can it be viewed as coming under any of the statute's substantive provisions.

Both parties rely on essentially the same two cases, but the Government misses the mark on their application to this case.  U.S. v. Dimeck, 24 F.3d 1239 (10th Cir. 1994) was an appeal from a conviction after trial.  The issue in that case was whether the defendant, who had transported and delivered money to a middleman who was a government informant, had engaged in a "financial transaction" for purposes of the money laundering statute.  The Government relies on Dimeck because in that case the Tenth Circuit held that the "movement of drug proceeds may constitute a transaction as defined by § 1956(c)(3)."  However, underlying that statement was the Tenth Circuit's recognition that § 1956(c)(c) defines "transaction" *"to include 'delivery' of the illegal proceeds."*  24 F.3d at 1246 (emphasis added).

In the instant case, there are no facts or inferences to come from the facts which suggest that Claimant delivered the currency to anyone or anyplace -- or, for that matter, purchased, sold, pledged, gifted, transferred or otherwise disposed of the currency as "transaction" is defined under the statute.  Thus, Claimant's conduct cannot meet the statutory definition of "financial transaction" under § 1956(c)(4) to mean the "movement of funds . . . by other means. . . ." because it does not first meet the definition of "transaction" under § 1956(c)(3).

Moreover, in Dimeck, the Tenth Circuit also held that although defendant's conduct met the definition of "financial transaction, his conviction for money laundering could not be supported on the basis of courier activity because that kind of transaction is not prohibited by the

statute.  There was no evidence that in delivering the money to a middleman, the defendant had ever become part of an effort to conceal or disguise the attributes or source of the money under § 1956(a)(1)(B)(i).  Thus, in the instant case, the Government is incorrect on two levels:  first, in arguing that Claimant's conduct constitutes a "financial transaction" under § 1956(c)(3) and (4), and second, that the Complaint supports an inference that the money was disposed of in any of the ways envisioned under the statute.

Both parties also cite to U.S. v. Reed, 77 F.3d 139 (6th Cir. 1996), in which the Sixth Circuit reversed the pre-trial dismissal of an indictment for money laundering.  The defendant in Reed was an attorney who arranged for the transfer of money to a courier, which was carried out.  In that case, the court found that the allegations stated a violation of the money laundering statute because defendant had engaged in a financial transaction with the intent to promote the carrying on of further drug activity, in violation of §1956(a)(1)(A)(i).  This case is easily and clearly distinguishable from the instant case as well.  In Reed, the defendant facilitated the repayment of past drug debts incurred by her client to another individual.  She used her office to facilitate the transfer of the money to a courier, who then took the money back to the individual to whom her client owed the money.

In the instant case, there was no delivery or transfer of the currency.   The Government's reference to the weight of the suitcase to suggest that Claimant would have had to unload the currency in order to take a flight back is speculative.[6]  Nor are there any allegations in the

---

[6] The Government's argument is based on the maximum allowable weight allowed on airlines.  Claimant points out the fallacies in the Government's theory by noting that commercial airlines limit checked baggage to 100 pounds apiece, and excess baggage could be transported for a fee.  Reply at 10, n.9.

Complaint which would infer that Claimant had the intent to promote unlawful activity (§1956(a)(1)(A)(i)) or to conceal or disguise the nature, location, source or ownership of the money (§ 1956(a)(1)(B)(i)). What the Government sets forth in the Complaint is a description of the Claimant's carrying or transporting of the money under admittedly suspicious circumstances. Both Dimeck and Reed are clear that simply carrying cash does not constitute a "financial transaction." Dimeck, 24 F.3d at 1247 ("The transportation of the money from Detroit to California in a box, suitcase, or other container does not convert the mere transportation of the money into money laundering"); Reed, 77 F.3d at 143 ("We do not hold that the mere transportation of cash meets the definition of a financial transaction").

For these reasons, I find that the Government's Complaint does not allege facts to support a reasonable belief that the currency is subject to forfeiture under 18 § 981(a)(1) based on a violation of 18 U.S.C. § 1956. Therefore, the Government's claim for relief under ¶ 41 in the Complaint will be dismissed.

2.      *18 U.S.C. § 1957*

Next, Claimant argues in a similar vein regarding forfeiture pursuant to 18 U.S.C. § 981(a)(1) based on 18 U.S.C. § 1957, specifically that the Complaint does not allege a monetary transaction by, through, or to a financial institution. The provision requires evidence that a defendant engaged or attempted to engage in a "monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity. . . ." The term "monetary transaction" means the "deposit, withdrawal, transfer, or exchange . . . by, through, or to a financial institution." § 1957(f)(1).

Section 1957 incorporates the definition of "financial institution" contained in Section

19

1956(c)(6), which in turn incorporates the definition set forth in 31 U.S.C. § 5312(a)(2), or the regulations promulgated under that Section.  31 U.S.C. § 5312(a)(2)(R) includes as one of the numerous definition of "financial institution," "any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside the conventional financial institutions system."

The Government construes this definition as broad enough to include the delivery or transfer of unlawfully derived money by a courier, yet does not cite to any legal authority or factually similar case.  The Court's review of the case law has not unearthed any, either.  The problem here is that while the Complaint describes the Claimant transporting money in luggage under certainly dubious circumstances, it contains no facts from which inferences of a transfer or delivery can reasonably be made.  This is not enough to give rise to a reasonable belief that the currency is subject to forfeiture under the requirements of 18 U.S.C. § 1957.  Therefore, the Government's claim for relief under ¶ 42 in the Complaint will be dismissed also.

    *3.*     *18 U.S.C. § 1960*

This provision makes it a crime to conduct, control, manage, supervise, direct or own all or part of an "unlicensed money transmitting business," which is defined as a "money transmitting business which affects interstate or foreign commerce in any manner or degree . . . ."  The statute also defines "money transmitting" to the transfer of funds "on behalf of the public by any and all means. . . ."  § 1960(b)(2).  Part of the activity proscribed by this statute is the "*transportation* or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used . . . to promote or support unlawful activity."  § 1960(b)(C)

(emphasis added).  The Complaint does allege sufficient facts to infer that Claimant was

transporting funds and that the Claimant was aware that the funds were connected to a drug-

related activity.  This would satisfy the requirements for a showing of conduct proscribed under

18 U.S.C. § 1960(b)(C).

      Claimant also argues that this statute is intended to reach business like Western Union

which come under the definition of "money transmitting businesses" as described in 31 U.S.C. §

5330(d)(1)(A)("Registration of money transmitting businesses").  The Government maintains that

the statute is not limited to formal money transmitting businesses.

      The phrase "money transmitting businesses" is defined in 31 U.S.C. § 5330(d)(1)(A) as

"any business other than the United States Postal Service which--(A) provides check cashing,

currency exchange, or money transmitting or remittance services, or issues or redeems money

orders, travelers' checks, and other similar instruments or any other person who engages as a

business in the transmission of funds, including any person who engages as a business in an

informal money transfer system or any network of people who engage as a business in facilitating

the transfer of money domestically or internationally outside of the conventional financial

institutions system. . . ."  Other than this statutory definition, neither party offers further legal

support for its respective position, nor has the Court uncovered any case law which would shed

light on what level of formality is required to constitute a "business" under § 18 1960(b)(1).

Moreover, discovery may shed more light on the degree and type of Claimant's participation, if

any, in such an enterprise.  Until such time, I find that the Government's Complaint meets the

threshold minimum requirements to withstand Claimant's motion to dismiss.

      *4.*      *18 U.S.C. § 1952*

Finally, paragraph 43 of the Complaint alleges a basis for forfeiture under 18 U.S.C. § 981(a)(1)(C) because the seized currency "constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1952 or a conspiracy to commit such offense.  Claimant contends that § 981(a)(1)(C) does not provide for forfeiture pursuant to 18 U.S.C. § 1952, but this is not so.  Conduct under § 1952 which is proscribed as "specified unlawful activity" is further defined in § 1957(c)(7), which in turn refers to § 1961(1) which then includes § 1952 as one of the numerous definitions of "racketeering activity."

Claimant's other argument, that the Complaint fails to state a claim under § 1952, has some merit, but ultimately fails.  Section 1952 prohibits travel in interstate or foreign commerce with intent to: "distribute the proceeds of any *unlawful activity*" or "otherwise promote, manage, establish, carry on or facilitate the promotion, management, establishment, or carrying on of any unlawful activity."  § 1952(a)(1) & (3).   "Unlawful activity" is defined in § 1952(b), *inter alia*, as any business enterprise involving narcotics or controlled substances in violation of state or federal law and any act indictable under Title 31 or 18 U.S.C. § 1956 or 1957.  As discussed earlier in this opinion, the Government's Complaint fails to allege facts connecting the seized currency to a financial transaction, as required for a violation of 18 U.S.C. §§ 1956 and 1957.

However, also as discussed above, the Complaint does sufficiently allege facts which give rise to a reasonable belief that the currency is subject to forfeiture because Claimant was engaged in an activity related to controlled substances.  Therefore, Claimant's motion is denied with regard to the Government's claim for relief brought under 18 U.S.C. § 981(a)(1)(C) based on 18 U.S.C. § 1952.

**THEREFORE,**

**IT IS ORDERED** that Claimant's Motion to Dismiss Complaint for Forfeiture In Rem, filed May 9, 2005 (**Doc. 15)** is GRANTED IN PART and DENIED IN PART:

(1)     The Motion is GRANTED with regard to those forfeiture claims brought under 18 U.S.C. § 981(a)(1) because the currency was involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 and § 1957 (Complaint ¶¶, 41, 42);

(2)     The Motion is DENIED with regard to those forfeiture claims brought under 21 U.S.C. § 881(a)(6) (Complaint ¶ 39);

(3)     The Motion is DENIED with regard to those forfeiture claims brought under 18 U.S.C. § 1960 (Complaint, ¶ 40);

(4)     The Motion is DENIED with regard to those forfeiture claims brought under 18 U.S.C. § 981(a)(1)(C) because the currency constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1952 or a conspiracy to commit such offense (Complaint ¶ 43).

_____
UNITED STATES DISTRICT JUDGE